## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

SEC Civil Action No.:  1:19-cv-02594-RM-SKC
Avoidance Action No.:

UNITED STATES SECURITIES
AND EXCHANGE COMMISSION,

      Receivership Plaintiff,

v.

MEDIATRIX CAPITAL INC. *et al.*,

      Receivership Defendants,

and

MEDIATRIX CAPITAL FUND LTD *et al.*,

      Receivership Relief Defendants.

_____

MARK B. CONLAN, Receiver,

      Plaintiff,

v.

GUARDIAN GROUP and KARIBU
SANA FRIENDS OF THE CARMELITE
MISSIONS TX,

      Defendants.

## COMPLAINT

Mark B. Conlan, as the Court-appointed substitute receiver ("Receiver"), by and through his undersigned attorneys, hereby alleges in support of this Complaint to avoid and recover certain transfers against the entities identified on **Exhibit A** ("Defendants") that:

## NATURE OF COMPLAINT

1.      This Complaint seeks to avoid and recover from the Defendants, or from any other person or entity for whose benefit a particular transfer was made, all fraudulent and preferential transfers of property, made to or for the benefit of the Defendants, from accounts owned and/or controlled by one or more of the "Receivership Defendants" or "Receivership Relief Defendants" (identified/defined herein) during the four-year period preceding the filing of this Complaint pursuant to the Colorado Uniform Fraudulent Transfer Act ("CUFTA"), C.R.S. § 38-8-101 *et seq.*, and as extended further by the one-year-from-discovery provision pursuant to C.R.S. § 38-8-110(1)(a), and/or other applicable law.

2.      The Defendants received donations (together, "Transfers"), regardless of any culpable intent, that constituted fruits of a fraudulent financial scheme to defraud investors, which included, among other things, Ponzi-like payments, misrepresentations, omissions, misappropriation, and other fraudulent conduct that accelerated trading losses and saddled investors with tens of millions of dollars in losses.  (*See* Summaries of Transfers to each of the Defendants, attached hereto as **Exhibit B**.)

3.      The Receiver, as representative and fiduciary of the creditors of Mediatrix Capital, Inc. and the other Receivership Defendants and Receivership Relief Defendants named in the captioned SEC Civil Action No. 1:19-cv-02594-RM-SKC, and further described below, seeks to

avoid, set aside, and recover the Transfers from the Defendants, as they received illicit proceeds from the Receivership Defendants' fraudulent scheme, to which they have no legitimate claim.

## JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction over this avoidance proceeding pursuant to 28 U.S.C. §§ 754 and 1692; and pursuant to this Court's *Order Appointing Receiver* in the proceeding ancillary to this case, *SEC v. Mediatrix Capital Inc., et al.*, No. 1:19-cv-02594-RM (ECF No. 153).

5.     Defendant Guardian Group, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce, the means and instrumentalities of interstate commerce, or of the mails, in connection with the acts, practices, and courses of business set forth in this Complaint, as Receivership Defendants conducted business out of an office in Colorado, and Colorado investors and brokers transacted within Colorado.

6.     Defendant Karibu Sana operates and has its principal place of business in the District of Colorado.  In addition, many of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within the District of Colorado.

7.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the acts and conduct that form the basis of the Receiver's causes of action occurred when Receivership Defendants fraudulently offered investments for sale from offices in Colorado and conducted business of the "Funds" (defined/described herein), and transferred a portion of the proceeds derived from the Receivership Defendants' fraudulent activity to the Defendants.

8.      This Court has jurisdiction over this proceeding under 15 U.S.C. § 77v(a) and 15 U.S.C. § 78aa because the proceeding is ancillary to the case *SEC v. Mediatrix Capital Inc., et al.*, presently pending before the United States District Court for the District of Colorado as Case No. 1:19-cv-02594-RM.

9.      This Court also has jurisdiction over the Defendants because they purposefully availed themselves of the benefits of this state by doing business in the State of Colorado such that the United States District Court for the District of Colorado may exercise personal jurisdiction over them.

## BACKGROUND AND PARTIES

10.      On September 12, 2019, the United States Securities and Exchange Commission ("SEC") brought an emergency enforcement action (the "SEC Complaint"), No. 1:19-cv-02594-RM (D. Colo.), against Michael A. Young, Michael S. Stewart, and Bryant E. Sewall (the "Individual Defendants"); and Mediatrix Capital Inc., Blue Isle Markets Inc., and Blue Isle Markets Ltd. (the "Entity Defendants," and together with the Individual Defendants, the "Receivership Defendants"); and against Relief Defendants Mediatrix Capital Fund Ltd., Island Technologies LLC, West Beach LLC, Salve Regina Trust, TF Alliance, LLC, Casa Conejo LLC, Hase Haus, LLC, DCC Islands Foundation, Keystone Business Trust, Weinzel, LLC, The 1989 Foundation, Mediatrix Capital PR LLC, Mediatrix Capital, LLC, Blue Isle Markets Inc. (Cayman Islands), Victoria M. Stewart, Maria C. Young, and Hanna Ohonkova Sewall (collectively, the "Receivership Relief Defendants").

11.      The SEC Complaint alleges an "international trading program that placed at risk more than $125 million of investors' funds."  The SEC alleges that from March 2016 to the filing

of the SEC Complaint, the Individual Defendants, through the Entity Defendants, "raised more than $125 million from investors in unregistered securities offerings by representing to investors that their money would be pooled and invested using [Receivership] Defendants' allegedly highly profitable algorithmic trading strategy.  [Receivership] Defendants falsely claimed to investors that from December 2013 through at least March 2019, their trading strategy had never had an unprofitable month and had returned more than 1,600%.  [Receivership] Defendants further claimed that their highly successful trading strategy had enabled Mediatrix Capital to accumulate assets under management of $225 million as of the end of 2018.  None of this was true."

12.    The SEC Complaint further alleges that "[i]n reality, since mid-2016, [Receivership] Defendants have misappropriated more than $35 million of investors' money by transferring it out of the Entity Defendants' bank and brokerage accounts rather than using the money for trading.  [Receivership] Defendants used investors' money to purchase luxury properties and vehicles, and diverted more than $5 million of additional investors' funds for other improper expenditures to perpetuate the fraud."

13.    The SEC Complaint further alleges that "[e]ven when [Receivership] Defendants used the remaining portion of investors' money for trading, [Receivership] Defendants' trading consistently lost money – losing more than $18 million from its trading in 2018 alone.  Because of [Receivership] Defendants' massive misappropriation and trading losses, Mediatrix Capital's assets under management are nowhere close to the amounts represented by [Receivership] Defendants.  For example, at year-end 2018, [Receivership] Defendants represented that Mediatrix Capital had $225 million under management, when in reality, the firm had approximately $35.3 million in assets under management (less than 16% of the amount claimed)."

14.     Significantly, the SEC Complaint also alleges that "[t]o induce investment into their failing trading strategy, [Receivership] Defendants defrauded investors by repeatedly misrepresenting the profitability of their trading, falsifying investors' account statements to show phantom profits, and making Ponzi-like payments to investors who opted to cash out their 'profits' — all in order to prop-up the façade of profitable trading."

15.     The SEC Complaint continues, alleging that "[Receivership] Defendants made numerous additional, material misrepresentations and omissions to investors regarding the supposed transparency of Mediatrix Capital's trading, as well as third party involvement in verifying trading results.  [Receivership] Defendants falsified investors' account statements and manipulated trading results to reflect profits rather than the actual losses resulting from their trading.  [Receivership] Defendants falsely claimed that Mediatrix Capital's trading results had been audited.  [Receivership] Defendants also made numerous misleading statements implying that Blue Isle 1 and Blue Isle 2 were independent, third-party administrators that received Mediatrix Capital's trading data directly from brokerage firms before reporting it to investors, when in fact, [Receivership] Defendants owned and controlled the Blue Isle entities and manipulated the trading data it conveyed to investors."

16.     The SEC Complaint further alleges that "[Receivership] Defendants' misrepresentations, omissions, and other fraudulent conduct had the same goal and effect:  provide investors with a false picture of trading profitability and a false sense of security, so as to induce additional investment to perpetuate the fraud.   [Receivership] Defendants' continued misappropriation and accelerating trading losses have driven their fraud to the brink of collapse.

Mediatrix Capital's most recent bank and brokerage account records indicate that only a fraction of investors' funds remain, likely saddling investors with tens of millions of dollars in losses."

17.     The SEC Complaint "also named numerous [Receivership] Relief Defendants because throughout the fraud, [Receivership] Defendants transferred millions of dollars of investors' money to spouses, other relatives, friends, and shell companies they owned or controlled as well as to other parties receiving no consideration for any of those transfers.  Each of the [Receivership] Relief Defendants received illicit proceeds from [Receivership] Defendants' fraud to which they have no legitimate claim."

18.     The SEC Complaint alleges, *inter alia*, violations of the Securities Act of 1933, the Securities Exchange Act of 1934, and the Investment Advisers Act 1940 and accordingly seeks, *inter alia*, "disgorgement of all [Receivership] Defendants' and [Receivership] Relief Defendants' ill-gotten gains from the unlawful activity set forth in [the SEC] Complaint."

## FACTS

19.     The Individual Defendants, as equal partners, formed Mediatrix Capital Inc. ("Mediatrix Capital") in 2015 and jointly operated it to solicit investors to invest in their currency trading program.

20.     The Individual Defendants formed Blue Isle Markets Inc. ("Blue Isle 1") to track trades, provide support for their trading operations, provide an entity through which they could assign account numbers to their investors, and to facilitate reporting fabricated account information to investors in Mediatrix Capital.

21.     In approximately April 2019, Blue Isle Markets Ltd. ("Blue Isle 2") acquired all the assets of Blue Isle 1 and, on information and belief, Blue Isle 2 performed the same function as Blue Isle 1.  (Blue Isle 1 and Blue Isle 2 are collectively referred to herein as "Blue Isle").

22.     From March 2016 through approximately September 2019, Mediatrix Capital and the Individual Defendants made two related securities offerings:  the Managed Account Foreign Exchange Funds ("MAFEF"); and the Mediatrix Capital Fund Ltd. ("The Fund") (collectively, the "Funds").

23.     The Receivership Defendants offered investments through the MAFEF, whereby investors' monies would be pooled and traded according to the Receivership Defendants' purported algorithmic trading strategy in foreign currency markets.

24.     The Individual Defendants created The Fund, whereby investors' monies would be pooled and "invest[ed] in securities, derivatives and other instruments to establish long and short investment exposures around the world."  Mediatrix Capital was the investment adviser to The Fund and made recommendations and investments of securities on behalf of The Fund.  The Individual Defendants jointly controlled Mediatrix Capital and thus acted as advisers to The Fund, as well.  Mediatrix Capital and the Individual Defendants solicited investors to purchase shares in The Fund (i.e., securities).

25.     Unbeknownst to investors, the Receivership Defendants pooled all monies from these Funds and transferred large portions (those portions that were not immediately misappropriated and diverted to the Individual Defendants themselves) into further pooled accounts at prime brokerage firms (the "Blue Isle Brokerage Accounts").

26.     Through their materially false and misleading statements, omissions, and fraudulent conduct, the Receivership Defendants raised over $125 million from Fund investors to operate the fraud, despite approximately 75% of investor monies having been misappropriated, lost in trading, or improperly spent to perpetuate the fraud.

27.     The Receivership Defendants used multiple offering documents to offer and sell these securities.  The Individual Defendants jointly prepared, reviewed, and disseminated to investors and prospective investors all of the offering materials provided to the Funds' investors.

28.     The Receivership Defendants have solicited investors in the United States and abroad.  Following solicitation, investors have invested tens of millions of dollars with Mediatrix Capital through the Funds, including investments through self-directed IRA accounts.

29.     As alleged herein, the Receivership Defendants misappropriated a portion of the funds invested in the Funds before those monies were transferred to the Blue Isle Brokerage Accounts or used for trading.  However, the majority of investor money invested in the Funds was ultimately pooled into the Blue Isle Brokerage Accounts to be traded using the Receivership Defendants' purported algorithmic trading strategy in foreign currency markets.

30.     After the investors' monies were sent to and pooled into a Blue Isle bank account, the Individual Defendants did one of the following:  (a) immediately misappropriated the money by diverting it to themselves and various non-trading entities they own and control and to third parties like the Defendants; (b) improperly spent the money on fees for sales representatives or other expenses to perpetuate the fraud; or (c) transferred the money to the Blue Isle Brokerage Accounts to be traded at a prime brokerage firm.   The Individual Defendants either misappropriated or improperly spent over $40 million of the approximately $125 million invested.

31.     The Blue Isle Brokerage Accounts, into which Fund investments were commingled, are not so-called "omnibus" accounts whereby brokerage firms maintain an aggregate account for an institutional customer, with subaccount designations denoting the funds of numerous of the institutional customer's underlying clients.  Rather, the Blue Isle Brokerage Accounts were only in Blue Isle's name and did not have any subaccounts on their books for individual investors in the Funds.  The individual investors were not customers at the prime brokerage firms, and the prime brokerage firms did not maintain any information regarding the individual investors.

32.     All investor monies in the Funds were pooled.  Fund investors were not provided access to the Blue Isle Brokerage Accounts where the actual trading took place and the assets were held.

33.     MAFEF investors were given an account number at Blue Isle, not at the prime brokerage firms.  MAFEF investors received online access to their purported accounts showing their investment amount and purported trading profits, which were actually just numerical representations—manipulated by the Receivership Defendants.

34.     Blue Isle also emailed the MAFEF investors daily and monthly account statements showing their purported ending balance, along with commissions and any performance fees charged.  These statements generally showed profits from trading in the accounts, ever increasing account balances, and the withdrawal of monthly performance fees based on the purportedly successful trading.

35.     Investors in The Fund did not have access to The Fund at Blue Isle, nor could they access the actual Blue Isle Brokerage Accounts.  Instead, investors in The Fund received monthly statements from The Fund's administrator that set forth the amount of The Fund shares owned by

the investor, the net asset value (NAV) per share, the value of the shares at the end of the month, and the return for the month.  As with the MAFEF account statements, The Fund statements generally showed consistent profits.

36.     Regardless of whether an investor invested through the MAFEF or The Fund, other than monies that were misappropriated or diverted elsewhere, the Receivership Defendants ultimately commingled and pooled investor monies into the Blue Isle Brokerage Accounts.  The Receivership Defendants then implemented one combined investment strategy for the Funds:  a purported fully automated algorithmic trading program where a group of nine algorithms trade up to thirty (30) current pairs plus gold.  The Receivership Defendants then provided Fund investors with false and fraudulent account statements reflecting their investment had grown through profits from the underlying trades.

37.     When trading Fund investors' money held in the Blue Isle Brokerage Accounts, the Receivership Defendants traded those funds in an undifferentiated fashion without respect to the ownership of those funds or the strategy of any particular investor.  Specifically, in implementing one combined investment strategy, the Receivership Defendants did not trade specific investors' accounts according to their individualized trading objectives, suitability, or desired risk profile.  The Receivership Defendants did not customize trades for specific investors by limiting asset classes, holding duration, or other technical parameters.  Only after completing the trading did the Receivership Defendants assign closed trades to individual investors and the Funds.  Because of the Receivership Defendants' pooling of all investor funds, losing open positions impacted all investors equally until closed.   In many instances, the Receivership Defendants held losing positions for months or years.  Similarly, closed positions had an equal impact on all investors

until the Receivership Defendants made an after-the-fact decision to allocate profits or losses from a specific trade to a particular Blue Isle account number.

38.     The Receivership Defendants' purported fully automated algorithmic trading was not profitable but rather resulted in substantial losses.

39.     The Blue Isle Brokerage Accounts, which held investments from both of the Funds, incurred monthly losses for at least twenty-four (24) months between March 2016 and April 2019, which ranged from negative $81,000 to several million in those months.

40.     In fact, the Blue Isle Brokerage Accounts reflected an aggregate profit only in the first month of trading in March 2016, where it profited by $575, and two months later in May 2016, when there was an aggregate three-month profit of approximately $353,000.

41.     After May 2016, the Blue Isle Brokerage Accounts never again attained an aggregate profit.  Or, put another way, gains in the Blue Isle Brokerage Accounts that were attained during any one particular month were never high enough to make up for the losses incurred during earlier months.

42.     From March 2016 through April 2019, the Blue Isle Brokerage Accounts incurred aggregate trading losses of approximately $19 million.

43.     The Receivership Defendants did not disclose these losses to investors in the Funds and, moreover, actively concealed these losses in order to fraudulently acquire new investors and induce new investors from existing investors.

44.     The Receivership Defendants, through Blue Isle, provided Fund investors with account statements that generally reflected positive month-to-month trading performance and

steadily increasing account balances that tracked Mediatrix Capital's advertised positive performance figures.

45.     These statements were false and did not reflect the actual trading or losses in the Blue Isle Brokerage Accounts, nor did they reflect the true balance in the investors' accounts.  The Blue Isle Brokerage Account records show trades reflecting significant losses were allocated to accounts in Mediatrix Capital's name.  On information and belief, the Receivership Defendants selectively allocated profitable trades (only within the Blue Isle software system) to the Fund investors' accounts to make it appear as though the overall trading was successful.  At the same time, the Receivership Defendants concealed large losing positions by nominally allocating the losses to supposed proprietary accounts, which exist only "on paper" in the Blue Isle software system.

46.     In raising funds for the Funds, the Receivership Defendants made numerous material false and misleading statements and omissions regarding, among other things, the profitability of trading, the amount of assets under management, the length of trading history, the use of investor proceeds, fees and costs, the auditing of the Funds, the transparency and access to information provided to investors and the Individual Defendants' affiliation with and control over related entities.

47.     Accordingly, each of the Defendants received the Transfers, which constituted proceeds from the Receivership Defendants' fraudulent activity, for which they provided no reciprocal goods or services, and to which they have no legitimate claim.  As a result, the Transfers should be returned to the Receiver for the benefit of the receivership estate.

## THE RECEIVER'S INVESTIGATION

48.     On October 20, 2021, this Court granted the SEC's *Unopposed Motion for Appointment of a Substitute Receiver* (ECF No. 283), requesting an Order substituting Mark B. Conlan of Gibbons P.C. as receiver in the underlying SEC enforcement action, to function under the terms and conditions of the existing Order Appointing Receiver (ECF No. 153) over the assets of Receivership Defendants and Receivership Relief Defendants ("Receiver Order").

49.     The SEC Complaint, which commenced the underlying SEC enforcement action, alleged that the Receivership Defendants operated a fraudulent investment scheme and concluded that the Receivership Defendants made Ponzi-like payments to investors seeking redemption (the "Net Winners"), whereby the Receivership Defendants disguised other investors' monies as trading profits, in the face of staggering losses, to maintain the appearance of a profitable enterprise.

50.     This Complaint covers the Transfers by the Receivership Defendants to the Defendants.

51.     The Receiver's investigation has revealed that many investors, after receiving the account statements reflecting phantom trading profits from the Receivership Defendant-run Funds opted to leave their money invested with those the Funds, some have invested additional monies with the Funds, and other investors received back more than the dollar amount than they invested. The documents the Receiver and his retained professionals reviewed in the course of his investigation reflect that the Receivership Defendants' investors were promised returns based on the value of their investments, which was not an accurate representation of the true value of their investments.  Although the financial statements of the Funds that the Receiver reviewed generally

showed consistent profits, after May 2016, the Funds never actually attained an aggregate profit. Indeed, from March 2016 through April 2019, the Funds incurred approximately $19 million in aggregate trading losses.  Accordingly, the Receiver can only conclude that the Net Winners were paid fictitious returns.

52.     The Defendants received in excess of $400,000 in Transfers from the Receivership Defendants.  Based on his investigation to date, the Receiver alleges that those Transfers constituted proceeds of a Ponzi-type scheme concocted by the Receivership Defendants and are therefore voidable.  Section 38-8-110(1)(a) of CUFTA provides that a plaintiff, such as the Receiver, has a one-year tolling/discovery period during which to investigate and bring claims such as those asserted herein, so that the Receiver's time to assert claims for fraudulent transfers made during the four-year lookback period set forth in the CUFTA is extended until, at a minimum, one year after the Receiver's appointment or October 20, 2021.

## <u>COUNT ONE</u>
### (Avoidance and Recovery of Fraudulent Transfers as Actual Fraudulent Transfers Pursuant to C.R.S. § 38-8-101 *et seq.*)

53.     The Receiver incorporates by reference paragraphs 1 through 52, above, as though set forth herein in full.

54.     The Transfers to the Defendants were made with the Receivership Defendants' actual intent to hinder, delay, or defraud creditors of the Receivership Defendants because the Transfers constituted proceeds of the Receivership Defendants' ongoing fraudulent scheme and the Receivership Defendants knew that, by making those Transfers, the Receivership Defendants put them beyond the control of their rightful owners, as well as legitimate creditors.

55.     The Receivership Defendants knew of the dependence on new investor money to provide cash for operations and to fund payments to prior investors.

56.     The Receivership Defendants knew:  (i) that the Receivership Defendants' assets were impaired; (ii) that the Receivership Defendants failed to record appropriate reserves for such impairment; and (iii) that their assets were therefore overvalued.

57.     The Receivership Defendants knew that the purported automated algorithmic trading program was not profitable but rather resulted in substantial losses.

58.     The Receivership Defendants did not disclose these losses to investors in the Funds and, moreover, actively concealed these losses in order to fraudulently acquire new investors and induce new investments from existing investors.

59.     Account statements from the Funds generally reflected positive month-to-month trading performance and steadily increasing account balances that tracked Mediatrix Capital's advertised positive performance figures.  However, these statements were false and did not reflect the actual trading or losses in the Blue Isle Brokerage Accounts, nor did they reflect the true balance in the investors' accounts.  And although the Receivership Defendants selectively allocated profitable trades to investors' accounts to make it appear as though overall trading was successful, the Receivership Defendants concealed large losing positions by nominally allocating the losses to supposed proprietary accounts, which existed only "on paper."

60.     The Receivership Defendants also made Ponzi-like payments by using investor money to meet redemption requests by other investors in order to conceal that the Receivership Defendants' trading had not returned profits, but rather resulted in large losses.

61.     The Transfers to the Defendants were therefore knowingly made out of the proceeds of the Receivership Defendants' fraudulent scheme, which continued to defraud investors by repeatedly misrepresenting the profitability of their trading, falsifying investors' account statements to show phantom profits, and making Ponzi-like payments to investors who opted to cash out—all in order to prop up the façade of profitable trading.  In other words, the Receivership Defendants made the Transfers with the actual knowledge that: (i) the Transfers constituted proceeds of their ongoing fraudulent scheme; (ii) they had no right to the funds constituting the Transfers; and (iii) they were depriving the lawful owners of the possession of those funds.

62.     The Receiver could not and did not have knowledge of the Transfers until, at least, before October 20, 2021, the day of his appointment.

63.     As a result of the foregoing, the Receiver is entitled to a judgment:  (i) avoiding and preserving the Transfers; (ii) directing that the Transfers be set aside; and (iii) recovering the Transfers, or the value thereof, from the Defendants for the benefit of the receivership estate.

**COUNT TWO**
**(Avoidance and Recovery of Fraudulent Transfers as Constructive Fraudulent Transfers Pursuant to C.R.S. § 38-8-101 *et seq.*)**

64.     The Receiver incorporates by reference paragraphs 1 through 63, above, as though set forth herein in full.

65.     The Receiver may recover the Transfers for the benefit of the receivership estate from the Defendants because the Transfers were made to the Defendants without the Defendants giving reasonably equivalent value to the Receivership Defendants in exchange for the Transfers.

66.     It is well-established that investors in Ponzi schemes, including where Ponzi-like payments of the type alleged herein are made, do not exchange reasonably equivalent value for

payments which exceed the investor's investments.  This is because such profits are fictitious and do not represent returns on legitimate investments.

67.     Even where the investor had no actual knowledge and did not participate in the fraud, that investor is required to return the fictitious profits.

68.     Having been made out of proceeds of fraudulent activity, the Transfers to the Defendants are similarly subject to avoidance, even if the Defendants had no actual knowledge of and did not participate in the Receivership Defendants' fraudulent scheme.

69.     Because they were paid out of proceeds of the Receivership Defendants' fraudulent and Ponzi-like scheme, the Transfers were  paid to the Defendants in connection with that scheme and without conferring any benefit on either the receivership estate or the defrauded investors in the Receivership Defendants' fraudulent and Ponzi-like scheme.

70.     The Transfers are therefore avoidable by the Receiver under C.R.S. § 38-8-101 *et seq.* generally, and by C.R.S. § 38-8-105(1)(b) specifically, and pursuant to Colorado common law on fraudulent conveyances.

71.     The Receiver could not and did not have knowledge of the Transfers, at least, before October 20, 2021, the day of his appointment.

72.     The Receiver may therefore recover the Transfers for the benefit of the receivership estate from the Defendants.

**COUNT THREE**
**(Unjust Enrichment)**

73.     The Receiver incorporates by reference paragraphs 1 through 72, above, as though set forth herein in full.

74.     The Receivership Defendants conferred a benefit on the Defendants by way of the Transfers.

75.     As a direct and proximate result of the Defendants' retention of the Transfers, the Receivership Defendants and the receivership estate have been diminished and, under the circumstances, equity dictates that the Defendants should return the Transfers and any assets they may have acquired with those funds, to the Receiver for the benefit of all of the defrauded investors and the receivership estate.

76.     When the Receivership Defendants made the Transfers to the Defendants, they did so from the proceeds of a Ponzi-type scheme concocted by the Receivership Defendants.

77.     The Defendants were enriched as a result of receiving the Transfers described in this Complaint by receiving something of value that belonged to the receivership estate.

78.     These enrichments violate equity and good conscience.

79.     These enrichments did not result from enforceable agreements between the Receivership Defendants and the Defendants.

80.     The Defendants were therefore unjustly enriched.

81.     The Transfers to the Defendants came at the expense of the receivership estate and the investors the Receivership Defendants defrauded.

82.     The Receiver could not and did not have knowledge of the Transfers until, at least, before October 20, 2021, the day of his appointment.

83.     By reason of the foregoing, the Defendants should be compelled by this Court to make restitution to the Receiver in the amount of the Transfers.

## PRAYER FOR RELIEF

**WHEREFORE,** the Receiver requests that the Court enter relief and judgment in his favor and against the Defendants, as follows:

a)      declaring that the Transfers are avoided and set aside as fraudulent transfers pursuant to CUFTA;

b)      directing and ordering that any Transfers avoided be preserved for the benefit of the receivership estate pursuant to the Receiver Order;

c)      directing and ordering that each of the Defendants, or any immediate or mediate transferee of each of the Defendants, turnover to the Receiver the full amount of or value of the Transfers;

d)      awarding judgment against each of the Defendants and in favor of the Receiver in an amount equal to:

1.  the full amount of the Transfers (and any other avoided transfers discovered after the date of this Complaint) made to each of the Defendants;

2.  pre-judgment interest at the maximum legal rate running from the date of the Transfers until the date of judgment herein;

3.  post-judgment interest at the maximum legal rate running from the date of judgment herein until the date the judgment is paid in full; and

4.   attorneys' fees and costs incurred by the Receiver in this suit;

e)      compelling each of the Defendants to make restitution to the Receiver in the amount that they were unjustly enriched by the Transfers; and

f)      such other and further relief as this Court may deem necessary and proper under the circumstances.

Respectfully submitted,

Dated:  August 31, 2022          **GIBBONS P.C.**

By:  */s/ David N. Crapo*
            David N. Crapo, Esq.
            One Gateway Center
            Newark, NJ  07102
            (973) 596-4500
            dcrapo@gibbonslaw.com

            *Counsel to Mark B. Conlan, as Receiver*

**EXHIBIT A**

| Defendant Name | Address |
|---|---|
| Guardian Group | 1900 NE3rd Street<br>Suite 106#40<br>Bend, OR 97701<br>**ATTN:**  Jeffrey D. Keith |
| Karibu-Sana Friends of the Carmelite Missions TZ | 15530 E Broncos Parkway<br>Suite 300<br>Englewood, CO 80112<br>**ATTN:** Carla Little |

**EXHIBIT B**

| Date of Payment | Recipient | Amount of Payment |
|---|---|---|
| 3/11/2019 | Guardian Group | $5,000 |
| 11/13/2017 | Guardian Group | $1,000 |
| 5/2/2017 | Guardian Group | $961 |
| 2/7/2018 | Guardian Group | $10,000 |
| 3/5/2018 | Guardian Group | $10,000 |
| 4/2/2018 | Guardian Group | $10,000 |
| 5/3/2018 | Guardian Group | $10,000 |
| 6/4/2018 | Guardian Group | $10,000 |
| 7/3/2018 | Guardian Group | $10,000 |
| 8/3/2018 | Guardian Group | $10,000 |
| 9/4/2018 | Guardian Group | $10,000 |
| 10/3/2018 | Guardian Group | $10,000 |
| 11/5/2018 | Guardian Group | $10,000 |
| 12/3/2018 | Guardian Group | $10,000 |
| 12/3/2018 | Guardian Group | $10,000 |
| 1/3/2019 | Guardian Group | $10,000 |
| 2/4/2019 | Guardian Group | $10,000 |
| 11/16/2017 | Guardian Group | $10.00 |
| 6/2/2017 | Guardian Group | $10,000 |

| 7/3/2017 | Guardian Group | $10,000 |
|---|---|---|
| 8/7/2017 | Guardian Group | $10,000 |
| 9/11/2017 | Guardian Group | $10,000 |
| 11/6/2017 | Guardian Group | $10,000 |
| 12/4/2017 | Guardian Group | $10,000 |
| 12/4/2017 | Guardian Group | $4,100 |
| 1/8/2018 | Guardian Group | $10,000 |
| 4/12/2018 | Guardian Group | $50,000 |
| | **TOTAL:** | 271,071 |
| | | |
| 11/17/2018 | Karibu Sana Friends of the Carmelite Missions TZ | $30,000 |
| 1/25/2019 | Karibu Sana Friends of the Carmelite Missions TZ | $25,000 |
| 9/29/2016 | Karibu Sana Friends of the Carmelite Missions TZ | $2,000 |
| 12/21/2016 | Karibu Sana Friends of the Carmelite Missions TZ | $400 |
| 1/26/2017 | Karibu Sana Friends of the Carmelite Missions TZ | $400 |
| 2/21/2017 | Karibu Sana Friends of the Carmelite Missions TZ | $400 |
| 3/16/2017 | Karibu Sana Friends of the Carmelite Missions TZ | $400 |
| 4/24/2017 | Karibu Sana Friends of the Carmelite Missions TZ | $400 |
| 5/18/2017 | Karibu Sana Friends of the Carmelite Missions TZ | $400 |
| 8/17/2017 | Karibu Sana Friends of the Carmelite Missions TZ | $400 |
| 1/17/2018 | Karibu Sana Friends of the Carmelite Missions TZ | $5,250 |

| | | |
|---|---|---|
| 4/5/2018 | Karibu Sana Friends of the Carmelite Missions TZ | $25,000 |
| 6/5/2017 | Karibu Sana Friends of the Carmelite Missions TZ | $50,000 |
| | **TOTAL:** | $140,050 |
| | | |